# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEW JERSEY

M.L. KING, JR.  FEDERAL BUILDING

50 WALNUT ST., 3RD FLOOR

NEWARK, NEW JERSEY 07102

DONALD H. STECKROTH

BANKRUPTCY JUDGE

(973) 645-4693

Fax: (973) 645-2606

## NOT FOR PUBLICATION

<div style="border:1px solid black;">

**FILED**

JAMES J. WALDRON, CLERK

## SEPT. 20, 2011

U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY:  s/ Ronnie Plasner, DEPUTY

</div>

September 20, 2011

## LETTER OPINION

## ORIGINAL FILED WITH THE CLERK OF THE COURT

Shapiro, Croland, Reiser, Apfel & Di Iorio, LLP
John P. Di Iorio, Esq.
Continental Plaza II
411 Hackensack Avenue
Hackensack, New Jersey 07601
*Counsel for Debtors,*
*Vizstara, LLC and Vizstara Professional, LLC*

The Law Office of Patrick W. Turner
Patrick W. Turner, Esq.
95 West Main Street, Suite 5-227
Chester, New Jersey 07930
*Counsel for Creditor,*
*Jonathan Schultz, State Court Appointed*
*Rent Receiver for 300 Sylvan Avenue LLC,*
*Debtors' Landlord*

McElroy, Deutsch, Mulvaney & Carpenter LLP
Eric R. Perkins, Esq.
40 West Ridgewood Avenue
Ridgewood, New Jersey 07450
*Counsel for Creditor,*
*300 Sylvan Avenue LLC*

Re:   **In re Vizstara, LLC**
      **Case No. 10-49434 (DHS)**
      **In re Vizstara Professional, LLC**
      **Case No. 10-49456 (DHS)**

Page 2
September 20, 2011

Dear Counsel:

Before the Court is a motion for relief from the automatic stay and related relief by Jonathan Schultz, in his capacity as the state court-appointed Rent Receiver ("Receiver") for the Debtors' landlord, 300 Sylvan Avenue, LLC ("Landlord"). Pursuant to 11 U.S.C. §§ 362(d) and 503(b)(1), the Receiver seeks the entry of an order: (1) permitting the continuation of eviction proceedings; (2) allowing an administrative expense for post-petition rent; and (3) compelling the Debtors to make payments for post-petition use and occupancy. The Debtors, Vizstara, LLC ("Vizstara") and Vizstara Professional, LLC ("Vizstara Professional") (together "Debtors"), oppose the motion and assert that no rent is due because the Debtors' principal and sole member, Dr. Nicholas Elian ("Dr. Elian"), made over $5 million in pre-petition payments to the Landlord that were used for debt service, carrying costs, and capital improvements on 300 Sylvan Avenue, Englewood Cliffs, New Jersey ("Property"). It is argued that the Debtors have a right to offset those payments against rents or, alternatively, the Court should treat the payments by Dr. Elian as rent paid on the Debtors' behalf under equitable principles and the quasi-contract doctrine.

Also before the Court is the Debtors' motion to assume the nonresidential real estate leases at issue, pursuant to 11 U.S.C. § 365(a).

For the reasons that follow, the Receiver's motion for relief from the automatic stay is granted, post-petition rent is to be paid by the Debtors, and the Debtors' motion to assume the leases is deemed moot. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a), 157(b)(1), and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (G), and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409. The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## FACTS AND PROCEDURAL HISTORY

### I.    Background

The Debtors filed their respective chapter 11 petitions on December 22, 2010 and the cases were administratively consolidated. On the same day, Dr. Elian and his wife, Martha Miqueo-Elian (together "Elians"), filed their own joint petition for relief under chapter 7. Dr. Elian is the sole member of Vizstara and Vizstara Professional. The Elians are individual creditors in the chapter 11 cases.

The Debtors operate a specialized dental practice and provide professional education for dentists the Property. The Debtors employed the Elians and approximately eight other persons, including dentists Anthony Classi and Jeni Classi-Glavicic (together "Classis"). The Debtors lease space in an office building on the Property pursuant to three separate agreements with the Landlord ("Leases").[1] The Landlord is a single-purpose limited liability corporation formed by

---

[1] Vizstara, Vizstara Professional, and Dr. Elian owe various amounts for monthly rent under the Leases. The base amount due under the Leases is $27,629.67 per month, calculated as follows: (1) Dr. Elian: $11,041.67; (2) Vizstara

Page 3
September 20, 2011

the Elians and the Classis to own and operate the Property at which the Debtors do business. (Cert. of Lisbeth Cload in Supp. of Chapter 11 Trustee [ECF Doc. 22], Jan. 13, 2011, at Ex. B, Operating Agreement) ("Cload Cert.")  The Elians own a two-thirds interest in the Landlord and the Classis own the remaining one-third interest. (Id.)  Dr. Elian is the sole Managing Member of the Landlord, with responsibility for the day-to-day operations and the sole power and authority to execute instruments on its behalf. (Id.)

In 2004, the Landlord purchased the Property with funds provided by the Elians and the Classis and a $5.2 million mortgage.[2]  (Decl. of Nicholas Elian, [ECF 34-4], Feb. 1, 2011, ¶ 8) ("Elian Decl. I")  At the time, the existing tenants generated sufficient cash flow to cover debt service and carrying costs. (Id. at ¶ 12)  However, the Property needed significant repairs and renovations in order to suitably house the specialized dental facility the Elians and Classis envisioned.

In 2007, Dr. Elian began extensive renovations on the Property's third floor.  The Elians contributed approximately $3.3 million and the Classis $200,000 to the project. (Id. at ¶¶ 14-15)  In March 2008, the Classis advised Dr. Elian that they had no additional monies to invest and no longer intended to join the emerging practice (Id. at ¶¶ 16-17)  Thus, the Elians were left to fund the remainder of the project themselves as well as all debt service, taxes, and carrying costs for the Landlord. (Id.)  With renovations completed, the Debtors began operating in November 2008. (Id. at ¶ 18)

## II.    Receiver and Landlord's Additional and Disputed Facts

The Classis, as one-third interest holders in the Landlord, allege that Dr. Elian misused his fiduciary powers as Managing Member by diverting funds for payment of the mortgage to the renovations.  They argue that Dr. Elian created a "lavish" facility at the expense of his obligations to make mortgage payments during 2008. (see Cload Cert. at ¶¶ 10-11)

It is a matter of record in the state court foreclosure case that the mortgage on the Property went into default in 2008, leading to a foreclosure action by the mortgagee against the Landlord and the Elians as personal guarantors. (Id., at Ex. C, April 2008 Foreclosure Complaint)  Dr. Elian managed to cure the default, however, a second default occurred in November 2009. (Id. at ¶ 14)  The mortgagee then commenced a second foreclosure action and sought the appointment of a rent receiver. On September 16, 2010, the state court appointed Mr. Schultz as the Receiver.  Pursuant to the rent receiver order ("Order"), the Elians and the Landlord were immediately obligated to turn over all keys to the Property, along with all cash received from its operations, including the Debtors' lease payments, to the Receiver.

The Debtors did not make a single rent payment after the Order was entered. (Cert. of Michael Nevins in Supp. of Mot. for Relief from the Automatic Stay, ¶¶ 9-11) ("Nevins Cert.)  Therefore, approximately two months after his appointment, the Receiver commenced eviction actions against the Debtors and the Elians.  The Debtors and the Elians filed their respective

---

Professional:  $12,519; and (3) Vizstara:  $4,069.  (Receiver's Mot. for Relief from Automatic Stay, ¶ 19) ("Stay Relief Motion")

[2] The Elians contributed approximately $1,500,000 and the Classis approximately $700,000, respectively, towards the purchase price.  (Elian Decl., ¶ 8)

Page 4
September 20, 2011

bankruptcy petitions exactly one month later.  As of the Petition Date, the Debtors owed a combined $57,328.17 in unpaid rent and late fees under their Leases with the Landlord.  (*Id.* at ¶ 11)  Post-petition, the Debtors have continued in their failure to pay rents.  When the present motion was filed, the Debtors owed a combined $54,342.29 in unpaid rent and late fees.  (*Id.* at ¶ 10)

The Receiver notes that the Leases were executed by Dr. Elian on both sides of the transactions, in his respective capacities as Managing Member of the Landlord and as the Debtors' sole principal.  It is alleged that the Leases contain below market rent rates and terms, including an absence of any security for performance of the Debtors' obligations thereunder.  (*Id.* at ¶ 14)

In light of the foregoing, the Receiver seeks relief from the automatic stay to continue his eviction actions.  He argues that the Debtors' failure to pay post-petition rent, cure the default, or otherwise provide adequate protection or adequate assurance of future performance under the Leases amounts to cause to lift the stay.  In addition, he argues that the Debtors have no equity in the Property and it is not necessary for an effective reorganization.  The Receiver submits that the Debtors, who presently employ only two dentists, can seek a smaller, less extravagant facility for their practice and related educational services.

## III.    Debtors' Additional and Disputed Facts

The Debtors assert that Dr. Elian personally contributed over $5 million to the Landlord from 2006 through 2009.  (Trial Br. of Debtors in Opp'n to Receiver's Motion for Stay Relief, pp. 1-2) ("Debtors' Trial Br.")  Dr. Elian states that he paid, on the Debtors' behalf, "no less than $2,097,159.66 to or for the benefit of [the Landlord]" between 2006 and 2009.  (Decl. of Nicholas Elian, [ECF 64-1], Apr. 19, 2011, ¶ 12) ("Elian Decl. II")  He asserts that this amount is substantially more than the total amount due under the Leases from November 2008 through April 2011, which is alleged to be $1,316,759.60.[3]  (*Id.* at ¶ 19)

Debtors' counsel acknowledged during oral argument that, aside from a single check containing the memorandum "300 Sylvan Rent," none of the payments from Dr. Elian were recorded as "rent" by the Landlord, the Debtors, or Dr. Elian.  Rather, they were recorded as "loans" made from Dr. Elian to the Debtors.  Nevertheless, the Debtors argue that Dr. Elian expected those payments to be credited as rent and relied on that expectation in advancing an additional $3.5 million to capitalize the Debtors and renovate the Property.  (Debtors' Trial Br., p. 2)

The Landlord concedes that, after receiving the monies from Dr. Elian, it made payments of approximately $2,165,000 between 2006 and 2009 toward the mortgage debt, real estate taxes, utilities, and repairs and renovations, to the benefit of the Property.  The Debtors argue that it would be inequitable for the Landlord or the mortgagee to benefit from those advances and the various capital improvements without crediting the Debtors for rent paid.  If the Debtors are

---

[3] This figure includes amounts due under the Elian Lease.  From November 2008 through April 2011, the various amounts due under the Leases were as follows: Vizstara $375,570, Vizstara Professional $122,070, and Dr. Elian approximately 819,086.60.  (Elian Decl. II, ¶ 18)  As of July 31, 2011, shortly before oral argument on the instant motion, the total figure had grown to approximately $1,454,385.94.  (Debtors' Trial Br., p. 9)

Page 5
September 20, 2011

entitled to offset those amounts against rent, or if the Court determines that the amounts ought to be characterized as "rent," then, it is argued, the Receiver and the Landlord would not be entitled to relief from the automatic stay because the amounts received exceed the rent owed.

## DISCUSSION

### I.    Relief from the Automatic Stay

When a debtor files for bankruptcy relief, the petition creates a broad stay of nearly all legal or equitable action against the debtor, including state court eviction actions like the one here. 11 U.S.C. §§ 362(a), (a)(3).  In turn, section 362(d) provides that bankruptcy courts shall grant creditors or other interested parties relief from the automatic stay for: (1) "cause, including lack of adequate protection" or, in the alternative, (2) with respect to a stay against a debtor's property, if there is no equity in the property and it is not necessary for an effective reorganization. 11 U.S.C. § 362(d).

"Cause" is not defined in the Bankruptcy Code.  However, courts have described it as "a broad and flexible concept." *In re The Score Board. Inc.,* 238 B.R. 585, 593 (D.N.J. 1999). A bankruptcy court has the discretion to determine whether equity dictates lifting the stay on a case-by-case basis.  *See, e.g., In re Wilson,* 116 F.3d 87, 90 (3d Cir. 1997); *Zagata Fabricators, Inc. v. Superior Air Prods.,* 893 F.2d 624, 628 (3d Cir. 1990); *In re DBSI, Inc.,* 407 B.R. 159, 166 (Bankr. D. Del. 2009).  In cases where a debtor seeks to assume a particular lease, it must perform all of the attendant obligations under such lease, including the payment of post-petition rent.  11 U.S.C. § 365(d)(3); *In re Goody's Family Clothing, Inc.,* 610 F.3d 812, 816 (3d Cir. 2010); *CenterPoint Props. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.),* 268 F.3d 205, 209 (3d Cir. 2001).  Thus, failure to pay post-petition rent may be "cause" to lift the automatic stay and permit a landlord to seek ejectment in the state court. *See, e.g., Zagata Fabricators,* 893 F.2d at 627-28; *In re Sweet N Sour 7th Ave. Corp.*, 431 B.R. 63, 69 (Bankr. S.D.N.Y. 2010).

### II.    Debtors' Set-Off Rights

The Debtors argue that 11 U.S.C. § 558 gives them the right to set-off the payments made to the Landlord on their behalf against the rent being claimed by the Receiver.[4]  However, the set-off defense is only available to the extent it exists under state law.  *See, e.g. In re Women First Healthcare, Inc.,* 345 B.R. 131, 134 (Bankr. D. Del. 2006); *In re PSA, Inc.,* 277 B.R. 51, 54 (Bankr. D. Del. 2002); *In re Papercraft Corp.*, 127 B.R. 346, 350 (Bankr. W.D. Pa. 1991).  Here, the Debtors fail to cite any New Jersey law giving them a right to set-off payments and capital improvements against the rent presently due under these particular circumstances.  It is undisputed that the payments were made by Dr. Elian or Mrs. Miqueo-Elian, not by the Debtors, and were booked as loans to the Debtors by all parties.  The Debtors themselves made no payments to set-off against the arrears and ongoing accruals.  None of the payments, with the exception of the single check previously mentioned, was ever recorded on the Debtors' books

---

[4] Section 558 provides, in pertinent part:  "The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses . . . ."

Page 6
September 20, 2011

and records as rent or pre-paid rent. Therefore, section 558 does not provide a defense to the failure to pay rent by the Debtors.

## III.    Quasi-Contract Doctrine

The Debtors further argue that the payments made to the Landlord on their behalf should be treated as rent under equitable principles and the quasi-contract doctrine. They are asking the Court to impose an agreement between the parties that would treat the payments as rent, regardless of the parties' intent. Absent such treatment, the Debtors submit that the Landlord will be unjustly enriched.

A quasi-contract, sometimes referred to as a contract implied-in-law, is not a contract at all. Rather, it is a "fictional promise" imposed by a court "for the purpose of bringing about justice without reference to the intention of the parties." *Wanaque Borough Sewerage Auth. v. Twp. of W. Milford,* 144 N.J. 564, 574–75, 677 A.2d 747 (1995) (citing *St. Paul Fire and Marine Ins. Co. v. Indemnity Ins. Co. of No. America,* 32 N.J. 17, 22, 158 A.2d 825 (1960)). "In appropriate circumstances, even though no intention of the parties to bind themselves contractually can be discerned," courts may force one party to perform for the benefit of an injured party. *See Arzoomanian v. British Telecomms., PLC,* 2007 U.S. Dist. LEXIS 2715 (D.N.J. Jan. 11, 2007) (quoting *Kopin v. Orange Prods., Inc.,* 297 N.J. Super. 353, 367-68, 688 A.2d 130, 136 (App.Div. 1997)); *Wanaque Borough*, 144 N.J. at 575. However, courts should employ the remedy with caution. *Callano v. Oakwood Park Homes Corp.,* 91 N.J. Super. 105, 108 (App. Div. 1966) (citing 17 C.J.S. *Contracts* § 6, pp. 566-570 (1963)); *see also Wanaque Borough*, 144 N.J. at 575 ("[legal] fictions tend to intrude into situations for which they were not invented.") (internal citation omitted). Significantly, "a [person] is not entitled to employ the legal fiction of quasi-contract to substitute one promisor or debtor for another." *Callano*, 91 N.J. Super at 110 (citing *Cascaden v. Magryta*, 247 Mich. 267, 225 N.W. 511, 512 (Sup. Ct. 1929) (internal quotations omitted).

Unlike actual contracts, where the promise defines the duty, in quasi-contracts the duty defines the promise. *Callano*, 91 N.J. Super at 108–109 (citing *St. Paul Fire and Marine,* 32 N.J. at 22). Thus, the "duty which . . . forms the foundation of a quasi-contractual obligation is frequently based on the doctrine of unjust enrichment." *Id.* The doctrine rests on the equitable principles that a person should not unjustly enrich himself at another's expense. There are two "essential elements" of a quasi-contract: "(1) that [one party] has received a benefit from the [other party]," and "(2) that the retention of the benefit . . . is inequitable." *Wanaque Borough*, 144 N.J. at 575 (quoting Frederic C. Woodward, *The Law of Quasi Contracts* 9 (1913)). The party seeking to impose the quasi-contract must prove that it conferred a benefit on its counterparty which would be unjustly retained without compensation and that, in conferring the benefit, the party expected remuneration at the time of performance. *Cohen v. Home Ins. Co.,* 230 N.J. Super. 72, 82, 552 A.2d 654 (App. Div. 1989) (citations omitted); *see also VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994) (discussing the unjust enrichment doctrine).

Here, it is undisputed that Dr. Elian transferred approximately $2 million to the Debtors and that some of this money flowed to the Landlord and was used for debt service. In order for the Court to find a quasi-contract and credit these payments as rent by the Debtors, the payments must have been advanced with the intention that Dr. Elian expected remuneration for them as pre-paid rent *at the time of performance. See VRG Corp.*, 135 N.J. at 554. In addition, the Court

Page 7
September 20, 2011

must find that it would be unjust for the benefit of the payments to be retained without giving the Debtors credit for rent paid.

Employing the quasi-contract doctrine in this case is made difficult by the fact that Dr. Elian cannot easily be separated from the Debtors and the Landlord. As noted above, he was the sole member of both Debtors and a two-thirds member of the Landlord, as well as its managing member. He directed and oversaw all of the relevant transactions in this matter. Inasmuch as the Debtors' and the Elians' bankruptcy proceedings have not been substantively consolidated, it is essential for the Court to observe and uphold the relevant corporate formalities involved.

To begin, it is important to note that Dr. Elian was in a position to structure the transactions in a way that was most beneficial to his own interests. He chose to record the payments as "loans" to the Debtors from himself and his wife. They were recorded as such on the Debtors' books and records, the Landlord's books and records, and on several years of personal tax returns filed by Dr. Elian. The Court was advised, and Debtors' counsel did not object, that all documents are consistent in their treatment of the payments and were all prepared by Dr. Elian or at his discretion. The Classis were not involved in these decisions.

Accordingly, by advancing and treating the payments as loans, Dr. Elian expected to be repaid by the Debtors if the businesses were successful. On the contrary, if the payments had been advanced and treated as pre-paid rent, they would have become an asset of the Landlord, in which Dr. Elian held only a two-thirds ownership interest, and could only have been repaid commensurate with that interest. Thus, by treating the payments as loans rather than rent, Dr. Elian structured the transactions so that he stood to realize a greater personal return.

In support of the argument that Dr. Elian nonetheless expected to be credited for rent based on these payments, Debtors' counsel makes much of the fact that Dr. Elian advanced the monies after his personal guaranty on the mortgage obligations had already been terminated.[5] Counsel argues that Dr. Elian could have simply walked away from the Property in 2005 or 2006. That he chose not to do so allegedly demonstrates his expectation that "rent" would be offset and with that expectation he went on to advance the additional $3.5 million in improvements and capital.

The Court does not find that Dr. Elian expected to be credited for pre-paid rent made on the Debtors' behalf at the time the monies were advanced and the transaction structured by Dr. Elian. Rather, it appears that Dr. Elian is attempting to utilize the legal fiction of quasi-contract for a purpose for which it was not designed, namely, to retroactively benefit himself and the Debtors. *See Callano*, 91 N.J. Super at 110 (citation omitted). The fact that Dr. Elian continued to inject funds into the Debtors and the Property after the guaranty expired does not prove he expected to be compensated in the way he now seeks. Rather, it is equally plausible, and the

---

[5] At oral argument, Debtors' counsel advised the Court that, at the time the mortgage loan was taken, the lender imposed certain conditions, including that Dr. Elian sign any lease personally, and in connection with the lease, that there be drawn out from the mortgage proceeds a certain amount in rent escrow. Both the Elians and the Classis allegedly signed guarantees on the mortgage obligations. However, by its own terms, the personal guarantees terminated in 2005.

Page 8
September 20, 2011

Court finds it more likely, that he was simply seeing an extensive and long-running project through to the finish.  Undoubtedly, Dr. Elian believed he would recoup his investment many times over from the successful operation of the Debtors and an increase in the value of the Property.

It is unfortunate that Dr. Elian's dream did not become his reality.  He was unable to pay the mortgage in late 2009, which resulted in the default that has yet to be cured.  Since that time, including over seven months post-petition, no rent has been paid.  Moreover, the Debtors continue to operate in the Property, yet they have failed to escrow monies for rent in the event the present motion was decided against them.

Finally, as to the $3.5 million spent on improvements to the Property, these expenditures are irrelevant because Dr. Elian should not have expected remuneration.  Improvements to a property are not credited against mortgage debt, no matter how greatly the property's value increases as a result.   Real estate is routinely foreclosed upon default and improvements to the property are not considered to unjustly enrich the mortgagor or lessor.

Turning to the unjust retention element, the Debtors argue that it would be a "complete forfeiture" if the Debtors are not credited with rent.  They argue that the amount of rent outstanding is far outweighed by the amounts advanced by Dr. Elian on their behalf.  The problem with this argument, however, is that the Landlord did not unjustly retain the payments.  Rather, it had an obligation to pay the mortgagee with the monies it received and it did so up to the point that Dr. Elian stopped making payments.

Furthermore, as loans, the payments made to the Debtors are assets of the Elians' chapter 7 estate.  The effect of treating the payments as rents would shift the assets from that case to the Debtors' chapter 11 case, for the benefit of Dr. Elian – insofar as he seeks to avoid being evicted and reorganize the Debtors at their current location – and to the potential detriment of the Elians' chapter 7 creditors.  Dr. Elian is understandably seeking to create the best of all possible worlds by transforming the loans into a pre-paid asset.  However, because it was Dr. Elian who structured the transactions as loans in the first place, the Court does not find injustice in treating them as such today.  Accordingly, the Debtors owe post-petition rent to the Receiver for their use and occupancy during the proceedings.

## CONCLUSION

The Court will not impose a quasi-contract on the parties that would treat the loans as pre-paid rent and alleviate the Debtors' obligation to pay post-petition rent under 11 U.S.C. § 365(d)(3).  As such, cause exists to lift the automatic stay.  The Receiver's motion is granted and the Debtors are directed to pay post-petition rent to the Receiver.  The Debtors' motion to assume the leases is deemed moot.

Page 9
September 20, 2011


An Order in conformance with this Opinion has been entered by the Court and a copy is attached.

Very truly yours,

s/    *Donald H. Steckroth*

DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE


Enclosure